## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**JOHN DOE,**

        **Plaintiff,**                                    Civ. Action No. <u>3:22-cv-00346</u>

**v.**

**MARSHALL UNIVERSITY**
**BOARD OF GOVERNORS; and,**
**DEBRA HART, in her individual and official capacity,**

## COMPLAINT

Plaintiff John Doe ("Plaintiff"),[1] for his complaint against Defendants Marshall University Board of Governors and Debra Hart, alleges, upon information and belief, as follows:

### PRELIMINARY STATEMENT

1.      This case involves Marshall University's abuse of its power in order to discriminate and retaliate against its own student for exercising his rights under Title IX.

2.      Title IX creates rights and remedies for students who experience on-campus sexual harassment. Just as importantly, however, it also confers important rights on students accused of sexual harassment.

3.      The rights of the accused under Title IX are critical, because the stakes are high. By a mere preponderance of evidence—and often based on nothing more than the uncorroborated testimony of an accuser—a student's career can be ended.

---

[1] Plaintiff's motion to proceed anonymously is forthcoming. Counsel for Plaintiff has communicated with Defendants regarding the identify of Plaintiff and other nonparties identified anonymously herein.

4.     Unfortunately, false complaints under Title IX are alarmingly common. The only hope for a student falsely accused is for a fair process that protects the rights of the accused just as zealously as the rights of the accuser.

5.     In this case, not only has Marshall deprived the plaintiff of many of the rights to which he is entitled under the law, but it has actively retaliated against him for exercising what rights he could.

6.     In 2020, the Plaintiff was the target of a false Title IX complaint (the "2020 Complaint"). The complaint was filed nearly a month after the alleged misconduct, but just days after he and the complainant ended their romantic relationship. Marshall commenced an investigation, but when the Plaintiff exercised his rights to request evidence from the accuser and interview witnesses, the complainant voluntarily dismissed her claim.

7.     Even after the complainant's voluntary dismissal, Debra Hart, Marshall's Title IX Coordinator, attempted to revive and continue the investigation, but was precluded from doing so following the intervention of Marshall's general counsel.

8.     Hart believed that the Plaintiff "got away with it" and set out to make him pay. When students returned to campus the next fall, Hart reached out to the Plaintiff's classmates, shared information about the 2020 Complaint, and actively solicited new claims against him. Hart's campaign against the Plaintiff resulted in two new Title IX complaints.

9.     The first new complaint was dismissed almost immediately because it did not allege any sexual misconduct covered by Title IX. Nonetheless, the Plaintiff was required to retain counsel to obtain dismissal of a claim that should never have moved forward at all.

10.     Having failed in her first attempt to retaliate against the Plaintiff, Hart dredged up a second new complaint from Jane Roe, a female student at Marshall (the "2021 Complaint").

Incredibly, the complaint was based on previously unreported conduct that had allegedly occurred more than nine months earlier, and Jane Roe admitted that: (a) she was intoxicated and high on illegal drugs at the time the alleged misconduct occurred and (b) she never would have filed the complaint if not for Hart's active solicitation and encouragement.

11.     Not only did Hart retaliate against the Plaintiff by soliciting the 2021 Complaint, but she and others in Marshall's Title IX Office have continued to discriminate against him by conducting an unfair and biased investigation and depriving him of important rights guaranteed by Title IX and the United States Constitution.

12.     Marshall violated its own "Title IX Grievance Procedures for Students" ("the Policy") and discriminated against the Plaintiff on the basis of sex by, among other things:

   a.  Allowing the Investigator to abandon the "neutral, fact-finding process" and to usurp the role of the Hearing Panel by resolving disputed facts;

   b.  Undermining the presumption of non-responsibility by presenting the Hearing Panel with an Investigation Report concluding that the Plaintiff was responsible for misconduct before the Hearing Panel had received any evidence;

   c.  Ruling that the Hearing Panel can consider testimony not subject to cross examination;

   d.  Denying a motion to continue the disciplinary hearing despite Jane Roe's failure to provide the required witness list;

   e.  Granting Jane Roe's *ex parte* request to testify remotely, without allowing the Plaintiff an opportunity to object;

   f.  Allowing Title IX Coordinator Debra Hart to continue presiding over the complaint after being identified as a fact witness;

   g.  Creating a conflict of interest by appointing an Investigator who is the direct supervisor of Jane Roe's Title IX Advisor;

   h.  Ignoring the testimony of the lone non-party eye-witness to the alleged misconduct solely because she was in a romantic relationship with the Plaintiff, while deeming the testimony of Jane Roe's boyfriend to be credible;

    i.  Relying on evidence of "prior conduct" to establish that the Plaintiff acted in accordance therewith;

    j.  Relying on personal opinions and statements about which witnesses had no personal knowledge;

    k.  Relying on highly prejudicial instances of alleged misconduct totally unrelated to the allegations in the complaint;

    l.  Failing to consider relevant evidence provided by the plaintiff;

    m.  Failing to draw any adverse inference from the Complainant's destruction of relevant electronic evidence;

    n.  Denying the Plaintiff his right to pose questions to witnesses and suggest additional avenues for investigation;

    o.  Improperly penalizing the Plaintiff and his witnesses for exercising their rights not to participate in certain aspects of the investigation;

    p.  Recommending a finding of "no responsibility" in the Plaintiff's cross-complaint alleging retaliation by Roe, despite Roe's admission that her knowledge of the Plaintiff's prior Title IX activity was the "sole reason" she filed her belated complaint; and

    q.  Failing to complete its investigation with a "reasonably prompt" timeframe;

13.    As a result of Marshall's unlawful retaliation and discrimination, the Plaintiff has been deprived of his rights under federal and state law and faces the immediate risk of unwarranted discipline or expulsion that would permanently damage his reputation and end his promising professional career before it begins.

**PARTIES**

14.    Plaintiff John Doe is a male, twenty-year-old rising junior at Marshall University, and resides in Cabell County, West Virginia.

15.     Defendant Marshall University Board of Governors ("Marshall") is the governing body that controls, supervises, and/or manages the affairs of the Marshall University, a West Virginia institution of higher education, and is located in Huntington, West Virginia.

16.     Defendant Debra Hart is sued in her individual capacity for all claims for relief made against her, except for the request for prospective injunctive and declaratory relief, in which case she is sued in her official capacity. Upon information and belief, Defendant Hart resides in South Charleston, West Virginia, within the Charleston Division of this judicial district.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction in this case under 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

18.     Venue is proper in this District under 28 U.S.C. § 1391. Defendants are residents of the State of West Virginia and reside in this District. The events or omissions giving rise to the claims in this case occurred in this District.

## BACKGROUND

### A. Filing and Dismissal of the 2020 Complaint

19.     In 2020, the Plaintiff was admitted to Marshall University's exclusive B.S./M.D. program, which allows students to both Bachelor of Science and Doctor of Medicine degrees on an accelerated schedule with no MCAT required and guaranteed, tuition-free acceptance to the Marshall University School of Medicine.

20.     Shortly after arriving on campus, the Plaintiff became friends with W.J., and soon thereafter they began a romantic relationship that lasted several weeks.

21.     Approximately a month later, the Plaintiff ended the relationship with W.J.

22.     A few days after the end of their romantic relationship, W.J. filed a complaint alleging sexual misconduct that had allegedly occurred many weeks before.

23.     In the time between the alleged misconduct and the filing of the complaint, while the Plaintiff and W.J. were dating, W.J. never told the Plaintiff or anyone else about the alleged misconduct.

24.     Upon receiving W.J.'s complaint, Title IX Coordinator Debra Hart initiated a complaint.

25.     At the stage of the proceedings when W.J. was required to provide actual evidence in support of her allegations, however, she chose not to cooperate with the investigation and eventually voluntarily dismissed the complaint.

26.     Even after W.J. voluntarily dismissed her complaint, Ms. Hart attempted to discipline the Plaintiff by imposing an onerous, ongoing no-contact order, in plain violation of the Policy.  The Plaintiff's counsel was forced to reach out to Marshall's general counsel to compel Ms. Hart to withdraw the improper order.

27.     After being forced to withdraw the improper no-contact order, Hart and others engaged in in ex parte communications with W.J. to encourage her to revive her complaint, and W.J. eventually attempted to do so.

28.     In order to effectuate the revival of W.J.'s claim, Ms. Hart violated the Policy once again by extending the appeal deadline, which had already passed.

29.     The plaintiff opposed W.J.'s belated appeal, and the Appeal Officer agreed. The case remained dismissed.

**B.  Debra Hart Retaliates**

30.     Debra Hart believed that the Plaintiff got away with it.

6

31.     So, when students returned to campus in the fall, Hart took unprecedented action to generate new claims against the Plaintiff.

32.     Nothing in the Policy authorizes the Title IX Coordinator to solicit or encourage complaints. Indeed, the Policy requires the Coordinator to play a completely neutral role.

33.     Nonetheless, in September 2021, Hart took it upon herself to reach out to female members of the B.S./M.D. program to inquire about any problems they might have had with Plaintiff.

34.     Initially, Hart's efforts dredged up a complaint from S.S., who accused the Plaintiff—himself an African-American—of "using an offensive racial word while mimicking lyrics from a rap song."

35.     In response to that complaint, the Plaintiff's counsel argued that, even if the allegations were true, lip-syncing a popular rap song did not constitute an act of sexual harassment as defined by the Policy, and was therefore subject to mandatory dismissal under Policy § VII.1

36.     Eventually, Marshall relented and dismissed S.S.'s complaint.

37.     Undeterred, Hart subsequently solicited the Complaint from Jane Roe.

### C.  Jane Roe's 2021 Complaint

38.     Though filed on September 23, 2021, Roe's Complaint involved a single act of misconduct that allegedly occurred nearly nine months earlier, on January 29, 2021.

39.     Roe has admitted that she would have never filed the complaint had she not been made aware of the Plaintiff's prior involvement in the 2020 Complaint.

40.     Roe alleges that, on January 29, 2021, she, the Plaintiff, and the Plaintiff's girlfriend, B.B., were drinking alcohol together in their Marshall dorm when they decided to go to B.B.'s vehicle to smoke marijuana.

41.     After some time in the car, the trio was approached by a police officer who did not issue any citation but asked them to leave the vehicle and return to their dorm.

42.     Upon their return to the dorm, the three students went together to the Plaintiff's room and sat on his bed.

43.     Eventually, the Plaintiff and B.B. began to make out, but Roe remained on the bed.

44.     According to Roe, while the Plaintiff was kissing B.B., he moved his hand to Roe's thigh and began to rub and squeeze it. Roe contends that she removed the Plaintiff's hand from her leg, but that she remained on the bed.

45.     A few minutes later, Roe alleges, the Plaintiff began to touch her thigh again, ultimately "moving his hand over her genital area above her clothing."

46.     At that point, Roe claims, she got up and tried to leave the room, but the Plaintiff "jumped up" and told her to "calm down."

47.     Roe sat back down on the bed and "returned to her phone" while the Plaintiff and B.B. continued kissing.

48.     Eventually, Roe asserts, the Plaintiff placed his hand on her genital area a second time.

49.     Again, she claims, the Plaintiff jumped up and asked her not to go, but B.B. intervened and convinced the Plaintiff to "let [Roe] leave."

50.     Roe alleges that, when she returned to her room, she received a video call from the Plaintiff, who wanted to apologize for the "bad experience in the parking lot."

51.     While on the call, Roe noticed that the Plaintiff appeared to be nude. She asked if the Plaintiff and B.B. had just had sex, and the Plaintiff responded that they had. According to Roe, the Plaintiff then pulled back B.B.'s sheet to expose her naked body over the phone.

52.     After the alleged incident, Roe and B.B. continued to be roommates, and the three continued to spend time together socially on a regular basis.

53.     The Plaintiff and B.B.—who is the only non-party eyewitness to the alleged incident—reject Roe's account.

54.     According to them, Roe was drunk and high and lingered awkwardly as they attempted to engage in sexual activity. This was a pattern—Roe had once waited outside the bathroom door and listened as the Plaintiff and B.B. engaged in oral sex, even timing their encounter on her cell phone.

55.     Both the Plaintiff and B.B. emphatically reject the claim that the Plaintiff placed his hand on Roe's genital area, that the Plaintiff prevented Roe from leaving the room, or that the Plaintiff exposed B.B.'s nude body to Roe during the video call.

56.      Indeed, both the Plaintiff and B.B. submitted to polygraph examinations that confirmed the truthfulness of their accounts.

**D. Marshall's Flawed and Discriminatory Investigation of the 2021 Complaint**

57.     Upon the filing of Roe's claim, Marshall commenced an investigation.

58.     The Policy, which sets forth procedures for investigating and resolving Title IX complaints, guarantees important procedural rights to the accused.

59.     Unfortunately, in investigating Roe's claim against the Plaintiff, Marshall violated and selectively enforced many of those provisions of the Policy and failed to provide the Plaintiff with the fair and effective process to which he was entitled.

60.     In the past, Marshall has used professional investigators, often attorneys, to investigate complaints about sexual misconduct. In this case, the appointed "Investigator," Dr. Monica Brooks, was a librarian with no professional experience or training in investigations.

61.     Dr. Brooks was selected based on her close personal and professional relationship with Ms. Hart.

62.     Under the Policy, the investigation is to be "neutral, fact-gathering process" culminating in the issuance of a Final Investigation Report.

63.     Specifically, the role of the investigator in preparing the Final Investigation Report is limited to: (1) outlining the evidence; (2) assessing the witnesses' credibility; and (3) making a recommendation about the sufficiency of the evidence, *i.e.*, whether sufficient evidence exists upon which a Review Panel *could* find the Plaintiff responsible for the alleged misconduct.

64.     In conducting the investigation and preparing the Final Investigation Report, Dr. Brooks violated and selectively enforced the Policy against the Plaintiff in numerous ways.

65.     Ms. Brooks improperly relied upon, and included in the Report, significant evidence in violation of the Policy.

*Reliance on "Prior Conduct" in Violation of the Policy*

66.     For example, in large part, the Report relied upon instances of "prior conduct" that are specifically prohibited by the Policy.

67.     Under the Policy, "prior conduct" of a respondent may be considered only for the limited purpose of "determining pattern, knowledge, intent, motive, or absence of mistake."

Consistent with the usual rules of evidence, prior conduct may not be used to establish a person's character in order to establish that the person acted in accordance therewith. Yet that is exactly how such evidence was used in Dr. Brooks' Final Investigation Report.

68.     According to the report, Dr. Brooks found the following "prior conduct to be relevant to [the] investigation":

1) Witness #1 stated that she filed a Title IX complaint against the Respondent and has seen him be culturally insensitive toward her roommate who is Muslim.
2) Witness #2 said she saw the Respondent being "super flirty" with her 15-year-old sister at a party. She said party attendees voiced concerns to her about his behavior toward her sister.
3) Witness #2 stated that she was aware of another alleged sexual incident on the part of the Respondent toward a female exchange student in high school.
4) Witness #2 was not surprised when she heard the Respondent was involved in multiple issues because nobody has told him "no" and "he gets what he wants."
5) Witness #4 said she was invited to the Respondent's room for drugs or alcohol on more than one occasion but chose not to associate with him.

69.     None of this "evidence," however, could be used for any of the permissible purposes under the Policy.

70.     There is no colorable argument that the testimony of any of these witnesses could be used to establish knowledge, intent, motive, or absence of mistake—none of which were at issue in the investigation.

71.     Instead, Dr. Brooks included this highly prejudicial, unreliable, and irrelevant evidence in the Investigation report solely in an attempt to damage the Plaintiff's character in the eyes of the Review Panel.

72.     Pursuant to the Policy, the Plaintiff requested that this evidence be stricken from the report, but Marshall refused to do so.

*Reliance on Personal Opinions and Evidence about Which Witnesses had no Direct Knowledge*

73.   The investigator also violated and selectively enforced the Policy against the Plaintiff by relying on personal opinions and evidence about which the witnesses had no direct knowledge.

74.   Although the Policy allows the investigator some discretion to determine the relevance of any proffered evidence, it specifically provides that the investigator generally should not consider "personal opinions," evidence not based on "direct observations or reasonable inferences," or "statements as to any party's general reputation for any character trait."

75.   Yet that is exactly what Dr. Brooks did.

76.   Among the "evidence" provided by "Witness # 2" and relied upon in the Final Report were statements that (a) the Plaintiff was a "flirty person," (b) that Witness # 2 was aware of "other alleged incidents with other girls" in high school that she did not witness herself; (c) and that she was "not surprised" to learn about Roe's allegations because "nobody has ever told [the Plaintiff] 'no' and "he gets what he wants."

77.   Statements (a) and (c) are no more than personal opinions that go to the Plaintiff's "general reputation," while statement (b) is not based on facts the witness directly observed. And none of those statements had any remote bearing on whether the allegations in the Roe's complaint actually occurred. Nonetheless, the Dr, Brooks determined that "the weight of [Witness # 2's] statement [was] high."

78.   Likewise, "Witness # 4" did not bear witness to any of the events alleged in the complaint, nor did she provide any information directly related to those allegations. Rather, she stated that: (a) the respondent "made her uncomfortable relating to homework or interpersonal interactions," (b) that she had seen the Plaintiff under the influence of drugs or alcohol on

campus and via social media, and (c) that, as a result, she had decided to no longer associate with the Plaintiff.

79.     Once again, this witnesses' personal opinions about the Plaintiff's character and observations unrelated to the alleged sexual misconduct had no relevance to these proceedings and are prohibited by the Policy.

80.     The Plaintiff requested that these statements be stricken from the Final Investigative Report, but Marshall refused to do so.

*Reliance on Highly Prejudicial Statements Completely Unrelated to the Complaint*

81.      In addition to the above, the Final Investigation Report also relied on and reports to the Review Panel a highly prejudicial allegation of prior conduct that was not in any way related to the allegations in the complaint.

82.     Like Witnesses #2 and #3, "Witness # 1" did not actually witness anything related to the January 29 incident. Nonetheless, the Final Investigation Report contains the gratuitous allegation that, according to Witness # 1, the Plaintiff has been "culturally insensitive toward her roommate who is Muslim."

83.     The Report itself concedes that "this issue is not related to the investigation."

84.     There was no reason for Witness # 1's statement to be included in the Report, other than Dr. Brooks' pattern of attempting to prejudice the Review Panel against the Plaintiff by reference to unrelated, unsubstantiated allegations of misconduct.

85.     The Plaintiff requested that this statement be stricken from the Final Investigation Report, but Marshall refused to do so.

*The Plaintiff and B.B. are Penalized for*
*Exercising their Right not to Participate in Aspects of the Investigation*

86.     The Policy clearly states that "neither party is required to participate in the investigation . . . and the Investigator, Decision-makers, and/or Review Panel will not draw any adverse inference from a decision by either of the parties not to participate."

87.     Consistent with that right, and on the advice of counsel, Plaintiff and B.B. declined to answer the Investigator's questions regarding possible drug and alcohol use.

88.     There was good reason for them to do so. Despite Dr. Brooks' false assurances during their interviews that the Plaintiff and B.B. were "safe," any information they provided concerning drug or alcohol use would not be privileged, could not remain confidential, and could be used against them in a criminal case or other proceeding.

89.     Nonetheless, in plain violation of the Policy, the Dr. Brooks expressly drew an adverse inference based on the Plaintiff's and B.B.'s refusal to respond to these questions.

90.     With respect to B.B., Dr. Brooks found her credibility to be "low," in large part because:

   a)  "When asked about drug or alcohol use on the night of January 29, she refused to answer";

   b)  "The witness seemed reticent to answer some questions, which made her seem dishonest";

   c)  "Her choice of verbiage is like the [the Plaintiff's] when stating that they would not speak to events that took place in the car in the parking lot"—i.e., alleged drug and alcohol use.

91.     Dr. Brooks drew the same impermissible inferences regarding the Plaintiff, finding that his credibility "seem[ed] low" in large part because he "would not answer several questions related to the events that took place on January 29."

92.     Plaintiff requested that these black-and-white violations of the Policy be stricken from the Report, but Marshall refused to do so.

*The Investigator Failed to Consider Relevant Evidence that Would Have Favored the Plaintiff*

93.     In addition to relying on a tremendous amount of improper evidence, Dr. Brooks also refused to consider and include in her Report substantial evidence in favor of the Plaintiff.

94.     For example, the investigator failed to consider evidence of polygraph examinations administered to the Plaintiff and B.B.

95.     To support their accounts, both the Plaintiff and B.B. submitted to polygraph examinations administered by an impartial and experienced examiner, retired Captain Sean Crosier. Captain Crosier has decades of experience administering polygraph examinations, and his work is regularly relied upon by state and federal courts throughout the country. Following examinations that addressed the critical factual disputes in this matter, Captain Crosier's analysis indicated that both the Plaintiff and B.B.'s responses were truthful.

96.     Nonetheless, other than in a list of evidence submitted by the Plaintiff, these polygraph examinations do not merit so much as a passing mention in Dr. Brooks' Report.

97.     Although the investigator has latitude under the Policy to determine relevancy, she is not entitled to simply ignore evidence. If Dr. Brooks believed that the polygraph examinations were not relevant—in contrast to the broad range of tangentially-related "evidence" relied upon in support of Roe's complaint—then Dr. Brooks was obliged to provide some analytical support for that conclusion.

98.     The failure of the Final Investigation Report to even address the significance of the polygraph evidence is indicative of a lack of rigor and an inherent bias against the Plaintiff.

99.     Marshall's discrimination against the Plaintiff is also apparent in Dr. Brooks' decision to discredit the lone non-party eyewitness to the events alleged in Roe's complaint, B.B.

100.    First, as explained above, the Dr. Brooks drew an impermissible adverse inference from B.B.'s decision not to answer questions about drug and alcohol use.

101.    Second, the investigator denigrated B.B.'s credibility because based on the circular reasoning that B.B.'s "account of th[e] evening conflicts with the Complainant's." In other words, the Dr. Brooks discredited B.B.'s testimony simply because she disagreed with Roe. Of course, the Dr. Brooks did not discredit Roe's testimony simply because it differed from that of B.B.

102.    Third, the Investigator expressly found that B.B.'s credibility was "low" because she and Plaintiff are romantically involved. Strikingly, however, the Dr. Brooks did not reach the same result with respect to "Witness # 3," who is romantically involved with Roe.

103.    Setting aside these impermissible or inconsistent factors, the only other reason given for discrediting B.B.'s testimony is that she appeared "nervous and uncomfortable." But that is an absolutely normal response under the circumstances, especially for someone like B.B., who has been diagnosed with and is medicated for General Anxiety Disorder, and who suffers PTSD from a prior sexual assault—facts that Dr. Brooks did not care to investigate.

104.    In a fair investigation, the existence of an eyewitness who passed a polygraph exam would carry significant weight. The fact that the investigator in this case gave that evidence the back of her hand indicates extreme bias toward the Plaintiff.

*The Investigator Failed to Apply the Same Scrutiny to Roe's Account as She Did to the Plaintiff's*

16

105.     In contrast to the Investigator's unfounded conclusions about the credibility of the Plaintiff and B.B., she appears to have applied virtually no scrutiny at all to the incomplete and inconsistent statements provided by Roe and her witnesses.

106.     Significantly, Dr. Brooks gave no weight to the fact that Roe waited nearly nine months to report the alleged sexual harassment, stating flatly that "a delay in reporting the alleged sexual incident does not in any way detract from the credibility of the Complainant [Roe]." But the Investigator does not say why this is so, and it defies logic. Of course, the fact that the report was delayed is not dispositive, but it is a factor that should have been acknowledged and explained—especially in light of the Roe's pre-complaint statements to others that she "had no problem" with Plaintiff.

107.     The Investigator's unwillingness to address this fact belies a substantial bias toward Roe.

108.     In addition, the Investigator failed to draw any adverse inference from, or even address, the fact that Roe selectively preserved favorable electronic communications while destroying others.

109.     Roe uses Apple products, including an Apple iPhone. Apple's iOS offers three options for the automatic preservation of messages: users can opt to "Keep Messages" for 30 days, one year, or forever. Inasmuch as Roe was able to provide the Investigator with messages that were substantially older than 30 days, it can be deduced that she has opted to preserve messages in iOS for at least one year.

110.     If that is the case, then Roe's assertion to the Dr. Brooks that she "did not save" communications with the Plaintiff and B.B. from the relevant period does not hold water—either

the Complainant had these messages and failed to produce them, or she selectively deleted some communications while preserving others.

111.    In either case, Roes' conduct not only violated the Policy, but should have cast serious doubt on her credibility.

112.    Finally, while cynically criticizing the Plaintiff and B.B. for the *consistency* of their accounts, Dr. Brooks entirely overlooked critical *inconsistencies* between the statements of Roe and her supporting witnesses.

113.    For example, while Roe stated that the Plaintiff touched her over the pants, Witness # 3 stated that Roe told him that the Plaintiff put his hands under Complainant's pants.

114.    And while Roe states that B.B. ultimately helped her leave the Plaintiff's room on the night of the alleged incident, Witness # 1 told the Investigator that Roe had informed her B.B. did not help assist the Complainant in leaving the room on the night of January 29.

115.    In a fair and unbiased investigation, these issues would have raised serious concerns about the Complainant's credibility – or at the very least the credibility of Witnesses # 1 and #3. In the Investigator's Report, however, they received no mention.

116.    Again, the fact that the Dr. Brooks ignored these red flags reveals a substantial bias against the Plaintiff.

*The Investigator Denied the Plaintiff his Right to Pose Questions to Witnesses and Suggest Additional Avenues for Investigation*

117.    The Policy guarantees all parties the right to review the Investigative File and respond by, among other things, "submit[ting] additional comments and information to the Investigator," "indentify[ing] any additional witnesses or evidence for the Investigator to pursue," and "submit[ting] any further questions they believe should be directed by the Investigator to the other party or any witness."

118.    The Plaintiff was denied these rights.

119.    In response to his review of the Investigative File, the Plaintiff provided a number of suggestions for additional investigation and questions to be posed to potential witnesses. Those suggestions and questions were generally not honored, as follows:

a)  The Investigator refused to consider the results of the polygraph examinations provided by the Plaintiff.

b)  The Investigator refused to produce a list of all persons identified by any witness who may have relevant evidence, producing only a list of those persons "deemed relevant" by the Investigator.

c)  The Investigator deemed "not relevant" and declined to include the Complainant's response to the question "are you willing to submit to a polygraph exam, at the Respondent's expense, concerning the allegations in your complaint?"

d)  The Investigator posed follow-up questions to Witness # 1, but declined to include those responses in the Final Investigation Report.

e)  The Investigator posed follow up questions to Witness # 2, but declined to include those responses in the Final Investigation Report.

f)  The Investigator declined to interview Captain Sean Crosier, despite the Policy's express provision for doing so

120.    Further, Dr. Brooks flatly declined to respond to twelve questions posed by the Plaintiff to Dr. Brooks herself, responding only that "the Investigator is not a witness during the investigation."

121.    There is no basis in the Policy for that refusal. The Policy expressly affords the Plaintiff the right to pose questions to "any witness," and the Policy expressly provides that the Review Panel "will request the presence of the Investigator" as a witness at the Hearing.  Indeed, the Investigator is likely to be the most critical witness at such a Hearing.

122.     By refusing to respond to the Plaintiff's questions, therefore, the Dr. Brooks has not only violated the policy, but deprived the Plaintiff of an important opportunity to develop evidence for his defense.

*The Investigator Usurped the Role of the Review Panel and*
*Undermined the Presumption of Non-Responsibility*

123.     In addition to all of the above, perhaps the most significant violation of the Plaintiff's rights arises from the Investigator's conduct in excess of her proper authority under the Policy.

124.     Under the Policy, the Plaintiff must be presumed "not responsible" unless and until the Review Panel, *after a full evidentiary hearing*, determines otherwise.

125.     *Only* the Review Panel can make this determination; the investigator is expressly prohibited from making a finding of responsibility.

126.     Nor is it the Investigator's job to *resolve* any disputed questions of fact. Rather, the investigation is to be a "neutral fact-gathering process."

127.     In other words, the Investigator's role is limited to cataloguing the relevant evidence and determining whether there is sufficient evidence that *could* support of a finding of responsibility.

128.     In brazen contradiction of the Policy, Dr. Brooks took it upon herself to usurp the Review Panel's exclusive factfinding role. Rather than simply outlining the relevant evidence, assessing the witnesses' credibility, and making a recommendation about the sufficiency of the evidence, Dr. Brooks' Final Investigation Report included explicit "findings" that purported to resolve the most important and hotly disputed facts in Roe's complaint, including findings that:

a)  The Plaintiff and B.B. consumed drugs and alcohol on the night of the alleged incident;

20

b) The Plaintiff revealed B.B.'s nude body to Roe in a FaceTime call on the night of the alleged incident;

c) The Plaintiff placed his hands on Roe's groin area on two occasions, without Roe's consent; and

d) The Plaintiff physically prevented Roe from leaving his room on the night of the alleged incident.

129.    The prejudicial effect of Dr. Brooks' unauthorized and premature factfinding cannot be overstated.

130.    As a result, the Plaintiff has been denied the two most fundamental rights afforded under the Policy. First, by communicating to the Review Panel via the Final Investigation Report that these matters have already been decided, Marshall has stripped the Plaintiff of his right to be presumed innocent.

131.    Second, by resolving critical, disputed facts at a premature stage, Marshall has deprived the Plaintiff of his right to have the allegations against him decided by the Review Panel *only after a hearing at which he is afforded the opportunity to present evidence on his behalf and challenge the evidence presented by the Complainant.*

132.    This prejudice cannot be easily undone. The Review Panel absolutely cannot be provided with a Final Investigation Report that purports to determine disputed facts, especially those facts that go directly to the ultimate question of responsibility. That job rests solely with the Panel itself.

133.    In addition, Dr. Brooks' decision to insert herself into the process of determining guilt or innocence, in clear violation of the Policy, raises substantial concerns about the impartiality of the Investigator and the investigation itself.

*Marshall Failed to Complete the Investigation within a Reasonably Prompt Timeframe*

134.   The Policy requires Marshall to complete any investigation within a "reasonable timeframe."

135.   Specifically, "the period from commencement of an investigation through Final Investigation Report will not exceed an estimated sixty (60) calendar days."

136.   That timeframe may be extended for "good cause" only.

137.   This procedural safeguard, which mirrors the constitutional guarantee to a speedy trial, ensures that any charges against a respondent—who is presumed innocent—do not linger, unduly burdening the respondent's personal life and academic progress. It is also intended to keep evidence from being lost or spoliated.

138.   The investigation of Roe's complaint was commenced on September 23, 2021.

139.   Accordingly, the investigation should and could have been completed by November 22, 2021.

140.   Instead, 114 days passed before the Final Investigation Report was issued—nearly twice the time permitted for the "typical" case.

141.   There was no reason for this inordinate delay.

*Marshall Takes No Action in Response to the Plaintiff's*
*Complaint — But Amends its Rules for Other Students*

142.   The Policy allows the Plaintiff to object to any aspect of the Report and request changes, which, as outlined above, the Plaintiff did.

143.   In response to the Plaintiff's objections, however, Marshall did not revise the report in any material way.

144.   Notably, on August 1, 2022, Marshall revised the Policy in many substantive ways that seem to reflect an effort to address issues raised by the Plaintiff.

145.    Incredibly, however, Director Hart has taken the position—without any authority for doing so—that the revised Policy does not apply to the Plaintiff's upcoming hearing.

**E.  Plaintiff Files a Cross-Complaint Based on Uncontested Evidence—Which Marshall Essentially Ignores.**

146.    In the course of the investigation of Roe's complaint, the Plaintiff learned that Roe admitted to Dr. Brooks that her complaint was filed specifically in response to learning that the Plaintiff had been able to get a previous Title IX complaint dismissed.

147.    Understanding that both the Policy and federal law prohibit retaliation in connection with a Title IX investigation, the Plaintiff filed his own cross-complaint for retaliation.

148.    In support of his complaint, the Plaintiff relied exclusively on Roe's own admissions to the investigator.

149.    As the Plaintiff pointed out, *according to Dr. Brooks' own Report*, the reason Roe did not file a complaint until nearly nine months after the alleged misconduct was because she had no intention of doing so until she learned that the Plaintiff had been involved (and exonerated) in previous Title IX proceedings.

150.    Specifically, Roe told Brooks that she did not "feel the need" to make her complaint until learning of Plaintiff's prior Title IX participation and did so only after "learning there were other Title IX cases pending with the [Plaintiff]."

151.    She later added that this was the "sole reason" for her complaint.

152.    During the course of the investigation of his retaliation complaint, the Plaintiff first learned of Ms. Hart's role in soliciting Roe's initial complaint, and requested that Hart be recused from presiding over both complaints.

153.    Hart declined to do so.

154.    During the investigation of the Plaintiff's cross-complaint, Roe provided manifestly false information to the investigator.

155.    For example, Roe attempted to refute the allegation of retaliation by telling the investigator that she did not learn about the Plaintiff's prior Title IX involvement until *after* filing her September 2021 complaint.

156.    That statement is clearly contradicted, however, by Roe's own prior email to the investigator, in which she stated clearly that "towards the end of the academic year, March-April 2021, I learned that there had been a previous Title IX case against [the Plaintiff]."

157.    In assessing the credibility of the witnesses involved in the Plaintiff's cross-complaint, the investigator once again demonstrated a tremendous degree of bias against the Plaintiff:

   a)  Once again, B.B. was found to have a "bias toward [the Plaintiff]" solely because she is in a romantic relationship with the Plaintiff, but "Witness #7"—Roe's boyfriend—was deemed "credible";

   b)  Several witnesses in support of Roe were deemed "credible" with no explanation therefore;

   c)  The sole reason given for finding "Witness #5" "credible" was the fact that she has "no knowledge" of retaliation by Roe;

   d)  The investigator made no finding whatsoever about the credibility of the Plaintiff, but only reiterated the mistaken finding that his claims were unsupported by evidence; and

   e)  Despite having made numerous claims that were inconsistent with or flatly contradicted by her prior written statements, the Investigator found Roe to be "entirely credible."

158.    Despite Roe's own prior admissions regarding the purpose for her complaint, and her indisputable falsehoods during the investigation, the Final Investigation Report concluded that Roe was "not responsible" for the alleged retaliation.

24

**F.  Marshall Continues to Retaliate and Discriminate Against the Defendant as The Review Panel Hearing Approaches.**

159.    Following the issuance of the Final Investigation Report in the Plaintiff's cross-claim against Roe, Marshall scheduled a Review Panel Hearing for August 22, 2022.

160.    Marshall continues to deprive the Plaintiff of important rights as the hearing approaches.

161.    For example, when Roe failed to provide a timely witness list, as required by the Policy, Marshall denied the Plaintiff's request to continue the hearing until Roe does so. Instead, Marshall maintains that Roe can provide evidence by simply "addressing" the Panel—in clear contravention of the Policy (and federal law), which prohibits the consideration of testimony not subject to cross examination.

162.    In addition, Marshall granted Roe's *ex parte* request to appear remotely without providing the Plaintiff with any notice of the request or opportunity to object. Relatedly, the University has failed to provide the Plaintiff with notice of whether any other witnesses will be appearing remotely.

163.    With less than two business days remaining before the scheduled hearing, the Hearing Officer still has not performed his duty to notify the Plaintiff of which proposed witnesses are deemed "relevant to the determination by the Review Panel" and may therefore testify. Further, the Hearing Officer has not indicated whether he has complied with his duty to secure the attendance of any Marshall-affiliated witnesses. The Plaintiff's ability to prepare his defense has been substantially prejudiced by Marshall's failure to provide this information.

164.    With less than two business days remaining before the scheduled hearing, Marshall has not yet ruled on the Plaintiff's request to disqualify a member of the Hearing Panel

who is also a member of the Marshall University Board of Governors, creating a clear conflict of interest under the Policy.

## COUNT I

### VIOLATION OF TITLE IX (20 U.S.C. § 1681) – SEX DISCRIMINATION (RETALIATION)
### AGAINST MARSHALL UNIVERSITY

165.    Plaintiff repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

166.    Title IX prohibits federally supported educational institutions from practicing discrimination on the basis of sex. *See* 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . . .").

167.    Marshall receives federal financial assistance.

168.    Title IX is enforceable through an implied private right of action. *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 703 (1979).

169.    The Supreme Court recognized nearly two decades ago that "the private right of action implied by Title IX encompasses claims of retaliation." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 171 (2005).

170.    "At the pleading stage, the plaintiffs are required to sufficiently allege two elements to state a Title IX retaliation claim. First, they must allege that they engaged in protected activity under Title IX, and second, they must allege that—as a result of their protected activity—they suffered an adverse action attributable to the defendant educational institution." *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 694 (4th Cir. 2018).

171.    Here, Plaintiff engaged in protected activity under Title IX by participating in Marshall's Title IX complaint process, endeavoring to obtain the dismissal of prior Title IX disciplinary complaints against him, and succeeding in doing so.

172.    As a result of Plaintiff's success in obtaining the dismissal of these prior complaints, Marshall retaliated against Plaintiff based on his sex by soliciting new Title IX complaints against Plaintiff from female students within Plaintiff's friend-cohort.

173.    Specifically, Marshall's Title IX Coordinator, Defendant Hart, solicited Jane Roe to file a new Title IX complaint against Plaintiff John Doe.

174.    As a result of Defendant Hart's personal solicitation and air of authority as Marshall's Title IX Coordinator, Jane Roe filed a Title IX complaint against Plaintiff John Doe.

175.    Upon information and belief, Jane Roe would not have filed her Title IX complaint against Plaintiff John Doe but for the personal solicitation and encouragement of Defendant Hart to do so.

176.    In addition, Marshall retaliated against Plaintiff by allowing Jane Roe's complaint against him to move forward where Roe only filed because of the nature of the disposition of the prior complaints against Plaintiff—that is, their dismissal.

177.    Due to Marshall's wrongful acts, Plaintiff has suffered and continues to suffer losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to, lost future earnings and loss of earning capacity, damage to and delays in his pursuit of higher education, and fear, anxiety, humiliation, and emotional distress.

## COUNT II

**VIOLATION OF TITLE IX (20 U.S.C. § 1681) – SEX DISCRIMINATION**
**(SELECTIVE ENFORCEMENT)**
**AGAINST MARSHALL UNIVERSITY**

178.     Plaintiff repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

179.     Title IX prohibits federally supported educational institutions from practicing discrimination on the basis of sex. *See* 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . . .").

180.     Marshall receives federal financial assistance.

181.     Title IX is enforceable through an implied private right of action. *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 703 (1979).

182.     In multiple instances, Marshall selectively enforced Title IX against Plaintiff based on his sex by intentionally disregarding its own rules (the Policy for Title IX proceedings) to Plaintiff's detriment, including, but not limited to as follows:

a.     Allowing the Investigator to abandon the "neutral, fact-finding process" and to usurp the role of the Hearing Panel by resolving disputed facts;

b.     Undermining the presumption of non-responsibility by presenting the Hearing Panel with an Investigation Report concluding that the Plaintiff was responsible for misconduct before the Hearing Panel had received any evidence;

c.     Ruling that the Hearing Panel can consider testimony not subject to cross examination;

d.     Denying a motion to continue the disciplinary hearing despite Jane Roe's failure to provide the required witness list;

e.     Granting Jane Roe's *ex parte* request to testify remotely, without allowing the Plaintiff an opportunity to object;

f.     Allowing Title IX Coordinator Debra Hart to continue presiding over the complaint after being identified as a fact witness;

g. Creating a conflict of interest by appointing an Investigator who is the direct supervisor of Jane Roe's Title IX Advisor;

h. Ignoring the testimony of the lone non-party eye-witness to the alleged misconduct solely because she was in a romantic relationship with the Plaintiff, while deeming the testimony of Jane Roe's boyfriend to be credible;

i. Relying on evidence of "prior conduct" to establish that the Plaintiff acted in accordance therewith;

j. Relying on personal opinions and statements about which witnesses had no personal knowledge;

k. Relying on highly prejudicial instances of alleged misconduct totally unrelated to the allegations in the complaint;

l. Failing to consider relevant evidence provided by the plaintiff;

m. Failing to draw any adverse inference from the Complainant's destruction of relevant electronic evidence;

n. Denying the Plaintiff his right to pose questions to witnesses and suggest additional avenues for investigation;

o. Improperly penalizing the Plaintiff and his witnesses for exercising their rights not to participate in certain aspects of the investigation;

p. Recommending a finding of "no responsibility" in the Plaintiff's cross-complaint alleging retaliation by Roe, despite Roe's admission that her knowledge of the Plaintiff's prior Title IX activity was the "sole reason" she filed her belated complaint; and

q. Failing to complete its investigation with a "reasonably prompt" timeframe;

183.    In the context of Marshall's numerous actions taken against Plaintiff while favoring Jane Roe in the application of its Policy, it is reasonable to infer that but for Plaintiff being a male, Marshall would not have repeatedly disregarded its own Policy to Plaintiff's detriment.

184.    Due to Marshall's wrongful acts, Plaintiff has suffered and continues to suffer losses of educational opportunities and benefits, along with injuries, damages and losses,

including, but not limited to, lost future earnings and loss of earning capacity, damage to and delays in his pursuit of higher education, and fear, anxiety, humiliation, and emotional distress.

## COUNT III

**VIOLATION OF THE FOURTEENTH AMENDMENT (42 U.S.C. § 1983)
PROCEDURAL DUE PROCESS
AGAINST DEFENDANT DEBRA HART**

185.   Plaintiff repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

186.   The Fourteenth Amendment guarantees procedural due process. U.S. Const. amend. XIV.

187.   To make a procedural due process claim, a plaintiff must allege "that he had a constitutionally cognizable life, liberty, or property interest"; (2) "that the deprivation of that interest was caused by some form of state action"; and (3) "that the procedures employed were constitutionally inadequate." *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013) (cleaned up).

188.   Plaintiff possesses a "property" interest in the continuation and completion of his medical education at Marshall. *Board of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 82 (1978).

189.   "To have a property interest subject to procedural due process protection, an individual must be entitled to a benefit created and defined by a source independent of the Constitution, such as state law." *Huang v. Bd. of Governors of Univ. of N.C.*, 902 F.2d 1134, 1141 (4th Cir. 1990) (citing *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972).

190.   "Almost forty years ago, the Supreme Court of Appeals of West Virginia recognized that a student has 'a sufficient property interest in the continuation and completion of his medical education to warrant the imposition of minimal procedural due process protections.'"

30

*Al-Asbahi v. W. Virginia Univ. Bd. of Governors*, No. 1:15CV144, 2017 WL 402983, at *11 (N.D. W. Va. Jan. 30, 2017) (quoting *Evans v. W. Va. Bd. of Regents*, 271 S.E.2d 778, 780 (W. Va. 1980)); *see also North v. W. Va. Bd. of Regents*, 233 S.E.2d 411 (W. Va. 1977).

191.    Second, Defendant Hart's threatened and certainly impending deprivation of that interest via her critical role in Marshall's Title IX badly flawed disciplinary process is caused by state action.

192.    Third, the procedures employed by Defendant Hart and otherwise at her direction were, and remain, constitutionally inadequate.

193.    Defendant Hart violated Plaintiff's procedural due process rights by denying him fair and impartial investigators and adjudicators and by restricting his ability to present a full and fair defense against Jane Roe's complaint, among many other acts and omissions described above.

194.    Plaintiff was denied due process because, among other things, the complaint against him has not been adjudicated in a timely manner; the rules applicable to the proceeding against him were not followed; Plaintiff has been permitted a limited right of cross-examination, including by arbitrarily refusing an in-person hearing; having a member of the Review Panel with an incurable conflict of interest due to her service as a member of the Defendant Marshall University Board of Governors; refusing to provide Plaintiff with a list of witnesses to be called by Jane Roe in the time required under the Policy; having the Title IX coordinator Defendant Hart repeatedly giving the appearance of support for Doe, including by refusing to continue the date of the review hearing despite the presence of good cause (the manner and timing of the hearing panel); and otherwise being thwarted from presenting a meaningful defense in the proceedings overall.

195.     Due to Hart's wrongful acts, Plaintiff has suffered and continues to suffer losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to, lost future earnings and loss of earning capacity, damage to and delays in his pursuit of higher education, and fear, anxiety, humiliation, and emotional distress.

## COUNT IV

### VIOLATION OF THE FOURTEENTH AMENDMENT (42 U.S.C. § 1983)
### EQUAL PROTECTION
### AGAINST DEFENDANT DEBRA HART

196.     Plaintiff repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

197.     Under the Fourteenth Amendment, Plaintiff had the right as a public-school student to personal security and bodily integrity and equal protection of the laws.

198.     Defendant Hart has been and remains a state actor acting under color of state law when she violated Plaintiff's clearly established rights under the Fourteenth Amendment.

199.     Defendant Hart subjected Plaintiff to violations of his clearly established right to the equal protection of laws by punishing him and threatening to further punish him using Marshall's Title IX disciplinary process based on his sex for the reasons stated above, where Jane Roe has been treated markedly differently.

200.     "In addition to [her] own alleged actions in putting the Plaintiff at a disadvantage in the complaint process compared to [his accuser], Defendant[] may be subject to supervisory liability" under the Equal Protection Clause. *Rex v. W. Va. Sch. of Osteopathic Med.*, 119 F. Supp. 3d 542, 554 (S.D. W. Va. 2015).

201.     Defendant Hart failed to adequately train and supervise the investigator to conduct a thorough and impartial investigation of the allegations against Plaintiff, including to follow Marshall's own Policy.

202.    The investigator's conduct, as described above, shows that Plaintiff was treated differently based on his sex in violation of the Equal Protection Clause.

203.    Due to Hart's wrongful acts, Plaintiff has suffered and continues to suffer losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to, lost future earnings and loss of earning capacity, damage to and delays in his pursuit of higher education, and fear, anxiety, humiliation, and emotional distress.

## COUNT V

**VIOLATION OF THE WEST VIRGINIA HUMAN RIGHTS ACT
SEX DISCRIMINATION
AGAINST MARSHALL**

204.    Plaintiff repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

205.    The West Virginia Human Rights Act ("WVHRA"), West Virginia Code § 5–11–1, *et seq.*, prohibits discrimination on the basis of sex in places of public accommodation.

206.    Public educational institutions constitute public accommodations. *See Carroll K. v. Fayette Cnty. Bd. of Educ.*, 19 F. Supp. 2d 618, 624 (S.D. W. Va. 1998) (citing *Bd. of Educ. v. West Virginia Human Rights Comm'n*, 385 S.E.2d 637 (W. Va. 1989)).

207.    Marshall University is a public educational institution.

208.    The above-described actions of Marshall constitute violations of the West Virginia Human Rights Act, W. Va. Code § 5–1–1, *et seq.*, and the regulations promulgated pursuant thereto, by subjecting Plaintiff to unlawful sex discrimination.

209.    As a result of the fact that Marshall's agents, including Defendant Hart, engaged in and perpetrated the above-described acts, Marshall is strictly liable for the sex discrimination.

210.    Due to Marshall's wrongful acts, Plaintiff has suffered and continues to suffer losses of educational opportunities and benefits, along with injuries, damages and losses,

including, but not limited to, lost future earnings and loss of earning capacity, damage to and delays in his pursuit of higher education, and fear, anxiety, humiliation, and emotional distress.

**COUNT VI**

**AIDING AND ABETTING**
**VIOLATION OF THE WEST VIRGINIA HUMAN RIGHTS ACT**
**AGAINST DEFENDANT DEBRA HART**

211.     Plaintiff repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

212.     The above-describe acts of Defendant Hart constitute aiding and abetting unlawful discriminatory practices. The WVHRA "provides for a cause of action against individuals who aid or abet an unlawful discriminatory act." *Larry v. Marion Cnty. Coal Co.*, 302 F. Supp. 3d 763, 776 (N.D. W. Va. 2018).

213.     In the context of the WVHRA, an individual may be found to be liable for aiding and abetting a discriminatory practice if that individual knows the act breaches a duty and the individual "gives substantial assistance or encouragement to" the discriminatory conduct of another. *Klug v. Marshall Univ. Joan C. Edwards Sch. of Med.*, No. CV 3:18-0711, 2019 WL 1386403, at *7 (S.D. W. Va. Mar. 27, 2019).

214.     Here, the above facts demonstrate that Defendant Hart, in her critical role as Title IX Coordinator, provided substantial assistance and encouragement to the discriminatory conduct of Marshall in depriving Plaintiff of his legal rights on the basis of sex.

215.     Due to Hart's wrongful acts, Plaintiff suffered losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to, lost future earnings and loss of earning capacity, damage to and delays in his pursuit of higher education, and fear, anxiety, humiliation, and emotional distress.

**COUNT VII**

**NEGLIGENCE**
**AGAINST DEFENDANT HART**

216.    Plaintiff repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

217.    At all relevant times, Defendant Hart owed Plaintiff a duty of care under the circumstances in light of her role as Title IX Coordinator at Marshall University, where Plaintiff attends as a student.

218.    Defendant Hart violated her duty of care to Plaintiff in numerous respects as demonstrated by her above-described actions in connection with the Title IX program at Marshall and the complaints filed against and by Plaintiff. This includes, among other things, Defendant Hart's unsanctioned solicitation of Jane Roe's complaint against Plaintiff.

219.    Due to Defendant Hart's negligent acts, Plaintiff has suffered and continues to suffer losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to, lost future earnings and loss of earning capacity, damage to and delays in his pursuit of higher education, and fear, anxiety, humiliation, and emotional distress.

**COUNT VIII**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**AGAINST DEFENDANT HART**

220.    Plaintiff repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

221.    To state a claim for intentional infliction of emotional distress under West Virginia law, "a plaintiff must allege '(1) conduct by the defendant which is atrocious, utterly intolerable in a civilized community, and so extreme and outrageous as to exceed all possible

bounds of decency; (2) the defendant acted with intent to inflict emotional distress or acted recklessly when it was certain or substantially certain such distress would result from his conduct; (3) the actions of the defendant caused the plaintiff to suffer emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.'" *Davis v. Milton Police Dep't*, No. CV 3:20-0036, 2020 WL 2341238, at *9 (S.D. W. Va. May 11, 2020) (quoting *Travis v. Alcon Labs., Inc.*, 504 S.E.2d 419, 425 (W. Va. 1998)).

222.    Defendant Hart's conduct was "fraudulent, malicious, or otherwise oppressive." *W. Va. Reg'l Jail & Corr. Facility Auth. v. A.B.*, 766 S.E.2d 751, 762 (W. Va. 2014).

223.    "Whether conduct may reasonably be considered outrageous is a legal question, and whether conduct is in fact outrageous is a question for jury determination." *Davis*, 2020 WL 2341238, at *9 (quoting Syl. Pt. 7, *Love v. Georgia-Pac. Corp.*, 550 S.E.2d 51, 53 (W. Va. 2001)).

224.    Defendant Hart's conduct towards Plaintiff may reasonably be considered outrageous.

225.    As set forth in detail above, Defendant Hart has repeatedly and with impunity demonstrated a bias against Plaintiff in connection with her role as Title IX Coordinator at Marshall University. She took it upon herself to generate, without authorization, a new disciplinary complaint against Plaintiff after Plaintiff successfully obtained dismissal of prior such complaints, repeatedly failed to following Marshall's own Title IX policies and procedures, refused to permit Plaintiff a full and fair opportunity to present a defense and cross-examine witnesses against him, and otherwise failed to ensure a full and fair disciplinary process.

226.    Due to Defendant Hart's outrageous acts, Plaintiff has suffered and continues to suffer losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to, lost future earnings and loss of earning capacity, damage to and delays in his pursuit of higher education, and fear, anxiety, humiliation, and emotional distress.

***

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff respectfully requests the following relief:

1. Trial by jury;

2. Judgment against Defendant Marshall, and Defendant Hart in her individual capacity, for compensatory and consequential damages in an amount to be determined at trial, plus expenses and court costs;

3. Declaratory and injunctive relief against Marshall and Defendant Hart in her official capacity;

4. Punitive damages;

5. Pre-judgment and post-judgment interest at the maximum allowable rates at law;

6. Reasonable attorney's fees and costs;

7. Nominal damages;

8. Any other relief to which Plaintiff may seek or be entitled to under law or equity.

Dated: August 18, 2022                              **PLAINTIFF JOHN DOE**,

                                                    **By Counsel**:

                                                    /s/ Ryan McCune Donovan

Ryan McCune Donovan (WVSB #11660)
J. Zak Ritchie (WVSB #11705)
HISSAM FORMAN DONOVAN RITCHIE PLLC
P.O. Box 3983
Charleston, WV 25339
681-265-3802 *office*
304-982-8056 *fax*
rdonovan@hfdrlaw.com
zritchie@hfdrlaw.com